**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CITY OF SANFORD, FLORIDA, A MUNICIPAL CORPORATION; AND STATE EX REL., CITY OF SANFORD, FLORIDA, A MUNICIPAL CORPORATION;**

**Plaintiffs,**

**v.** **Case No.: 6:24-cv-01983-AGM-CAB**

**GENERAL DYNAMICS CORPORATION, A FOREIGN CORPORATION; SIEMENS CORPORATION, A FOREIGN CORPORATION; MONI HOLDINGS LLC, A FOREIGN CORPORATION; SIEMENS CARRIER NETWORKS, LLC, A FOREIGN CORPORATION; SIEMENS REAL ESTATE, INC., A FOREIGN CORPORATION; AND GENERAL DYNAMICS LAND SYSTEMS, INC., A FOREIGN CORPORATION,**

**Defendants.**

---

**ORDER**

THIS CAUSE comes before the Court on three motions to dismiss (collectively, the "Motions") filed by the Defendants seeking to dismiss Plaintiffs' Amended Complaint (Doc. # 69). The Motions are (1) Defendants General Dynamics Corporation and General Dynamics Land Systems, Inc.'s ("General Dynamics") Motion to Dismiss (Doc. # 82); (2) Defendant Siemens Corporation's ("Siemens") Motion to Dismiss (Doc. # 83); and (3)

Defendant MONI Holdings LLC's ("MONI") Motion to Dismiss (Doc. # 85). Plaintiff City of Sanford ("Sanford") filed a response to each motion (see Docs. # 86, 87, 88) and the Defendants replied (see Docs. # 94, 95, 97). On review of the Motions, the responses, and the replies, the Motions are due to be granted in part and denied in part, and the Amended Complaint is due to be dismissed with instruction to replead.

## I. BACKGROUND

Sanford is a municipal corporation within Seminole County, Florida, situated about 20 miles northeast from the City of Lake Mary. Sanford filed this action against Defendants General Dynamics, Siemens, and MONI for allegedly contaminating the city's public drinking water with hazardous chemicals. Sanford contends that those chemicals leached into the ground at one or more manufacturing facilities in Lake Mary and migrated through the groundwater to Sanford.

The Defendants operate or operated facilities where circuit boards were cleaned using a variety of solvents and chemicals. These chemicals included trichloroethylene ("TCE"), trichloroethane ("TCA"), dichloroethene ("DCE"), among others. To stabilize and extend the life of the chemicals, the Defendants used 1,4-dioxane ("1,4-D"), a synthetic industrial chemical. 1,4-D is a common industrial chemical that has been used as a chemical stabilizer for chlorinated solvents. Dating back to the 1950s, many different industries and products used or contained 1,4-D. 1,4-D is resistant to biodegradation and moves easily through groundwater, and the Environmental Protection Agency ("EPA") has classified 1,4-D as "likely to be carcinogenic to humans."

According to Sanford, the Defendants knowingly and routinely poured these chemicals directly into the ground, into barrels with leakage issues, and disposed of solvents down drains at the Lake Mary facility (the "Lake Mary Site"). As a result, Sanford alleges that its water supply was contaminated with 1,4-D, among other pollutants, after the chemicals migrated through the groundwater. Sanford is concerned that the concentration of these chemicals will rise in the water supply over time.

In 2001, industrial chemicals, including 1,4-D, were first detected in the groundwater beneath the Lake Mary Site. In 2007, the Defendants installed a "pump and treat" system and began treating the area around the Lake Mary Site with a groundwater recovery and treatment system. In 2016, the Florida Department of Environmental Protection ("FDEP") entered into a "Restoration Agreement" (the "Agreement"), in which the Defendants agreed to voluntarily remediate the chemical exposure. The Agreement provides that the parties will be governed by Florida law.

The Agreement's purpose was to promote "certainty, efficiency and accountability and to safeguard the drinking water resources for the citizens of the City of Lake Mary (the 'City') and State of Florida." The Agreement was intended to "supplement, not supplant, the requirements of Chapter Florida Administrative Code Chapter 62-780."[1] The Agreement itself was considered an agency action by FDEP, subject to notice and comment, and laid out the Defendants' obligations to comply with FDEP directives in remediating the contaminated area.

[1] Chapter 62-780 of the Florida Administrative Code governs site rehabilitation conducted at areas contaminated with hazardous substances, solvents, petroleum products, and other pollutants.

Groundwater and Surface Water Cleanup Target Levels ("GCTLs"), as that term is defined by FDEP, are the acceptable levels of contamination at a water treatment plant's point of distribution. When FDEP entered into the Agreement with the Defendants in 2016, the GCTL for 1,4-D was 3.2 micrograms per liter (ug/L). In 2016, sampling around the Lake Mary Site reflected 1,4-D contamination levels at 0.67 ug/L.

In 2015, just a year before the Agreement was signed, the Florida Department of Health issued an advisory guideline for 1,4-D levels in drinking water called a "health advisory level," or "HAL." At that time, consuming drinking water contaminated with 1,4-D over the course of a lifetime was "virtually certain not to cause adverse human health effects" at a level of 0.35 ug/L. Even though the HAL was only advisory, the Defendants and FDEP agreed to reduce concentrations of 1,4-D in the Lake Mary water supply to under 0.35 ug/L, in line with the HAL.

Ultimately, despite the Defendants' agreeing to reduce concentrations of 1,4-D in the Lake Mary water supply, in the years that followed concentration levels remained above the HAL even though it was below the GCTLs. In 2020, FDEP approved the Defendants' final Remedial Action Plan ("RAP") to bring 1,4-D levels at the point of entry to Lake Mary's water treatment center below the HAL, and keep them there.

Meanwhile, water samples collected in 2016 from Sanford's main water plant detected 1,4-D at a concentration above the HAL but below the GCTL. Sanford conducted further sampling and testing of its drinking water and determined several of its wells contained 1,4-D and other contaminants. In 2022, FDEP directed the Defendants to conduct further testing to determine the amount of potential contaminant migration. Yet the Defendants refused.

The Defendants concluded, based on their own experts' opinions, that the Defendants were not responsible for the chemicals found in Sanford's wells.

Sanford got its own experts. Sanford's experts concluded the opposite. Sanford's experts opined that the Lake Mary Site was the most likely source of the 1,4-D and other pollutants in Sanford's water. FDEP conducted its own testing as well and it, too, concluded that the Lake Mary Site was the likely source of contamination.

The Florida Geological Survey (a division of FDEP) conducted its own analysis on the Lake Mary Site. It concluded that the Lake Mary Site was responsible for the presence of 1,4-D in wells throughout Seminole County, and that the contamination is "uniquely characterized" by the "consistent comingling of 1,4-dioxane (1,4-D) with 1,1-dichloroethene (1,1-DCE)." Since 1,1-DCE is a Lake Mary Site-specific contaminant for which there is no other source in the area, researchers concluded that the Lake Mary Site was the likely source of the chemical migration. The findings confirmed that contaminants from the Lake Mary Site migrated more than 2.5 miles.

In 2025, FDEP rejected the Defendants' RAP, concluding that it failed to adequately address migration of 1,4-D from the Lake Mary facility. Specifically, the denial order stated that testing showed 1,4-D contamination exceeded the GCTLs in certain wells and had migrated beyond the previously established boundary. FDEP then directed the Defendants to complete assessment and site rehabilitation of 1,4-D contamination in the areas into which it had migrated, including Sanford. The Defendants again refused and contested the factual findings identifying the Lake Mary Site as the source of the 1,4-D migration.

Sanford contends that its levels of water contamination have remained low because Sanford works hard to keep the levels low. Its efforts to remediate include turning off certain wells and building out a new water treatment infrastructure. But now it has become necessary to build an entirely new water treatment facility. Sanford wants the Defendants to pay for the new facility, since it was the Defendants' refusal to remediate that requires that facility to be built.

Sanford filed this suit against the Defendants alleging several claims, including: public nuisance under section 376.305, Florida Statutes (Count I); trespass (Count II); strict liability for discharge of "ultra-hazardous substances" into Sanford's groundwater (Count III); violation of the Pollutant Discharge Prevention and Control Act, sections 376.30–376.319, Florida Statutes (Count IV); injunctive relief pursuant to section 60.05, Florida Statutes (Count V); breach of contract for failing to perform obligations under the Agreement, of which Sanford is a third-party beneficiary (Count VI); and declaratory relief (Count VII).

## II. LEGAL STANDARD

On a motion to dismiss, the court limits its consideration to the four corners of the complaint and any exhibits attached to it. *Thaeter v. Palm Beach Cnty. Sheriff's Off.*, 449 F.3d 1342, 1352 (11th Cir. 2006) (cleaned up). The court must accept factual allegations as true and draw reasonable inferences in the plaintiff's favor. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). While "detailed factual allegations" are unnecessary, the allegations must consist of more than "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks and citations omitted). To survive a motion to dismiss, the complaint must plead sufficient facts to state a claim that is "plausible

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). All in all, "the factual allegations must be enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (cleaned up) (quoting *Twombly*, 550 U.S. at 555).

The court is not bound to accept as true statements in a complaint that are legal conclusions. *Iqbal*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Moreover, a claim may be dismissed if there is a dispositive legal issue that precludes relief. *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

Extrinsic evidence may be considered at the motion to dismiss stage if it is central to the plaintiff's claim and the authenticity of the evidence is not challenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). If a contractual agreement attached to the complaint in a contract dispute contradicts the plaintiff's allegations, the court need not accept the complaint's allegations as true. *See Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019). "[W]hen the exhibits [attached to a complaint] contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

## III. ANALYSIS

### A. At This Stage of the Case, Sanford Has Adequately Pled Injury-in-Fact.

Article III of the United States Constitution limits the jurisdiction of the federal courts to the consideration of "Cases" and "Controversies." U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the

constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The "irreducible constitutional minimum" of standing consists of three elements: "(1) [the plaintiff] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The requirements of standing are "not mere pleading requirements," but rather are an "indispensable part" of a claim in which each element must be supported "with the manner and degree of evidence required" at each successive stage of litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, it is the plaintiff's burden to "clearly allege facts demonstrating each element." *Spokeo*, 578 at 338 (cleaned up). Further, "[s]tanding is to be determined as of the time the plaintiff's complaint is filed, and is not altered by events unfolding during litigation." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005) (cleaned up).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the trial court's authority to hear an action or certain claims in an action. "Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991). A Rule 12(b)(1) challenge can be either facial or factual. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003). A facial attack challenges a court's subject matter jurisdiction based on the allegations in the complaint. *Id.* In a facial attack, a court accepts the complaint's allegations as true. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys. Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). Conversely, a factual attack

contests the truth of allegations in the complaint. *Morrison*, 323 F.3d at 924 n.5. In a factual attack, a court can look beyond the complaint and its exhibits and may consider evidence such as deposition testimony and affidavits. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009).

Siemens and MONI lodge a facial attack on the Amended Complaint under Rule 12(b)(1). They contend that Sanford failed to plead allegations sufficient to establish an "injury in fact." Additionally, Siemens and MONI argue that Sanford's claims are not yet ripe for adjudication.

The "[f]irst and foremost" of standing's three elements is the injury-in-fact requirement. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* at 340. (quoting Black's Law Dictionary 479 (9th ed. 2009)).

Merely alleging that a statutory right has been violated is not sufficient to plead the existence of an injury-in-fact. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 440–41 (2021); *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 997 (11th Cir. 2020). "Article III standing requires a concrete injury even in the context of a statutory violation," and a "bare procedural violation, divorced from any concrete harm" does not suffice. *Spokeo*, 578 U.S. at 341; *see also Hunstein v. Preferred Collection and Mgmt. Servs.*, 48 F.4th 1236, 1242 (11th Cir. 2022) ("A bare statutory violation is not enough, no matter how beneficial we may think the statute to be.") (internal quotations omitted); *id.* at 1248 ("Because [plaintiff] has alleged only a legal

infraction—a 'bare procedural violation'—and not a concrete harm, we lack jurisdiction to consider his claim.").

Siemens and MONI argue that the allegation of trace amounts of 1,4-D in the groundwater is not enough to confer standing on Sanford. Siemens argues that through "artful" pleading, Sanford has obscured the levels of 1,4-D present in its groundwater by generally alleging the contamination of "wells"—which include monitoring wells not used for drinking—along with other wells outside of Sanford. Siemens asserts that Sanford never alleges its *drinking* water is unsafe or imminently threatening to its citizens, much less that the trace levels of 1,4-D found are harmful. Accordingly, Siemens asks this Court to reject Sanford's "single molecule theory" that the Defendants can be held liable for trace amounts of contaminants without ever alleging the de minimis amounts that pose a health risk.

Sanford responds that contamination of its groundwater with "even one molecule of 1,4-D and other contaminants" is a concrete injury in fact. Sanford points to the substantial remedial steps it has taken to reduce 1,4-D levels, including reducing use of contaminated wells, shutting down other wells, and undertaking a costly, ongoing investigative process. Sanford further points out that, given the soluble and transmissible nature of the contaminants, the threat of further and increased contamination remains imminent.

In support of its argument, Siemens relies on *Emerald Coast Utilities Authority v. 3M Co.*, where the district court rejected the argument of a public water utility that it had been injured "by the sheer presence" of chemicals in its water supply. 746 F. Supp. 2d 1216, 1226 (N.D. Fla. 2010). There, the Emerald Coast Utilities Authority ("ECUA") sued several chemical manufacturers over the contamination of the county aquifer with toxic, chemical byproducts

of the defendants' industrial activities. *Id.* at 1218. The claims included public nuisance, trespass, and negligence. *Id.* The defendants moved for summary judgment partly on the basis that ECUA lacked standing due to the absence of an injury in fact. *Id.* at 1223. Specifically, the defendants argued that the chemicals were detected at levels below the regulatory maximum contaminant level (akin to the GCTL), and below provisional health advisory levels (akin to the HAL). *Id.* at 1225. In sum, the defendants argued that "ECUA has no legally protected right to have its wells free of [chemicals] at such low concentrations, and the presence of the chemicals at the levels shown on this record has not caused ECUA any demonstrable harm or injury." 746 F. Supp. 2d at 1225–26. Like Sanford here, ECUA responded that "the relationship between the chemicals and the [maximum contaminant level] is not dispositive on whether a water supplier has suffered an injury" and argued that it was injured by the "sheer presence of these chemicals in its water supply." *Id.* at 1226.

The district court found that ECUA had not established an injury and granted summary judgment for lack of standing. The court found that "not only did the contamination levels not exceed the [maximum contaminant level], but additional undisputed facts show that ECUA has not suffered any injury as a result of the presence of these chemicals in its water supply." *Id.* at 1228. For example, the evidence showed that the water supply had never been contaminated above any EPA advisory level and no further evidence was presented to suggest that the current levels were harmful. *Id.* Although evidence was presented about the *potential* harmful effects of the substances on human health, the evidence did so only in general terms, and "lack[ed] any discussion of the requisite contaminant levels necessary to produce harmful

effects in humans, and notably makes no connection between the levels in ECUA's wells and any dangerous conditions." *Id.*

The court further rejected ECUA's arguments to find injury based on the costs associated with remediation and testing, finding that the costs of testing were insufficient to establish an injury when they had not accrued prior to filing the action and there was no evidence to suggest that further contamination was "imminent." 746 F. Supp. 2d at 1229. In fact, the evidence showed that at the time the suit was filed, recent studies found the water was safe. *Id.*

Ultimately, the court rejected the notion of a "single molecule theory," noting a distinct lack of evidence showing that the chemicals were harmful, or indeed, at "what level they produce such harm and, further, how that level relates to levels in this case." *Id.* at 1231. Because standing is a jurisdictional question, the court found that without an injury in fact, summary judgment was warranted on all claims. *Id.* at 1232.

In response, Sanford points to *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 446 (S.D.N.Y. 2009) and *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161 (11th Cir. 2014). In *In re MTBE Products Liability Litigation*, New York City sued various corporations for their handling of a gasoline additive chemical, alleging that the defendants' misuse of the chemical contaminated the city's groundwater supply. *Id.* at 448. A defendant moved to preclude evidence of investigation and treatment costs for water wells until the City of New York established an injury in fact. *Id.* at 449.

The court ruled that New York City had standing because—under New York law—injury from a toxic substance occurs at the moment of contamination. *Id.* at 457. Under New

York's so-called "exposure rule," the injury accrued "at the time of impact" based merely on the introduction of chemicals into the groundwater. *Id.* Under New York law, "[s]tanding exists when a party has been harmed by another party's conduct, even if that harm is outweighed by other considerations and no damages ultimately result." *Id.* at 458 (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006)).[2]

In *Adinolfe*, the Eleventh Circuit affirmed that Florida law did not require contamination to rise to a certain level to establish an injury. 768 F.3d 1161 at 1172. *Adinolfe* arose from claims by hundreds of property owners in a residential area suing various corporations for groundwater contamination. *Id.* at 1164. The plaintiffs alleged that the companies discharged various toxic chemicals into the soil and groundwater at a nearby plant, and the chemicals migrated southward to an aquifer that supplied the plaintiffs' water. *Id.* One plaintiff developed cancer as a result, and the plaintiffs collectively alleged diminution of property values based on the contamination. *Id.* Plaintiffs' claims included negligence, strict liability for ultrahazardous activity, and nuisance. *Id.* at 1171.

The Eleventh Circuit rejected arguments that the plaintiffs lacked standing, recognizing that a majority of the plaintiffs alleged contamination on their land, diminution of their land value, and several plaintiffs alleged personal injuries arising from exposure to the contamination. *Id.* at 1172. The Eleventh Circuit further found that the district court erred in imposing a requirement that plaintiffs needed to allege contamination that "exceed[ed] the

---

[2] Apart from standing, however, the district court indicated that the City of New York must eventually show that the chemicals in the water will be "at a level sufficient to cause injury" to succeed on its damages claims. *Id.* at 460.

regulatory safe drinking water standard." *Id.* at 1173. In its reasoning, the Eleventh Circuit stated

> While the applicable regulatory standard may be instructive for a trier of fact as evidence of what the government deems safe for the public, it does not amount to an all-purpose benchmark for determining as a matter of law how much one can reasonably contaminate another's private property, much less a threshold issue that plaintiffs must preemptively address at the pleading stage to state tort claims under Florida law.

*Id.* at 1174 (cleaned up).

None of these cases are directly on point. First, Sanford's reliance on *In re MTBE Products Liability Litigation* is misplaced, because that case expressly dealt with New York's "exposure rule" where an injury is established at the moment of "impact." While Sanford argues that one molecule of contamination is sufficient to establish an injury in fact, Sanford cites to no Eleventh Circuit or Florida authority that establishes such a rule. The failure to cite legal authority "suggests either that there is no authority to sustain its position or that it expects the court to do its research." *Rapid Transit Lines, Inc. v. Wichita Devs., Inc.*, 435 F.2d 850, 852 (10th Cir. 1970). Florida is not New York, and Sanford has advanced no argument or authority that compels the conclusion that, under Florida law, a plaintiff has suffered an injury based on a "single molecule" or "impact" theory of contamination.

Where *In re MTBE Products Liability Litigation* is distinguishable on state law grounds, *Adinolfe* is distinguishable on its facts. In *Adinolfe*, the plaintiffs alleged injuries in the form of severe illness and decreased land values because of toxic chemical exposure. Those plaintiffs had "concrete" and "particularized" injuries attributable to the contaminants, notwithstanding regulatory levels. The Eleventh Circuit simply held that Florida law does not require a showing that the contamination must rise to a certain level to show injury. *See Adinolfe*, 768 F.3d at

1174. *Adinolfe* did not establish a bright-line rule that water contamination at any level amounts to an injury in fact.

*Emerald Coast* comports with *Adinolfe* and its reasoning is persuasive; however, like the other cases, it is distinguishable. *Emerald Coast* was decided on summary judgment, rather than at the pleadings stage. In *Emerald Coast*, the district court refused to adopt a bright-line rule establishing injury "by the sheer presence" of chemicals in the water supply, without more. *Id.* at 1226, 1228. The focus of the district court's analysis was a lack of evidence that the chemicals were harmful at the levels detected. The reason summary judgment was granted there was that the evidence did not support a demonstrable, actual injury.

Siemens argues that Sanford did not establish an injury-in-fact because it merely alleges that 1,4-D was detected in some generalized, nebulous assortment of wells that may-or-may-not be used in drinking water. And Sanford's response that its injuries are based on the "contamination of its groundwater" with "hazardous substances" which necessitated "remedial action" is not overwhelmingly persuasive. But standing need only be supported "with the manner and degree of evidence required" at a given stage of litigation. *Lujan*, 504 U.S. at 561. And at the motion to dismiss stage, the Court must accept the factual allegations within the Amended Complaint as true. *See Stalley ex rel. U.S.*, 524 F.3d at 1232. In relevant part, the Amended Complaint states that 1,4-D is a "hazardous substance . . . irrespective of any statutory or regulatory standards or recommendations that may have been promulgated by either statute or rule." Further, it states that 1,4-D contamination poses a "substantial threat to public health and welfare." Later, Sanford alleges that as a direct and proximate cause of the Defendants' disposal techniques, Sanford's groundwater (which supplies the drinking

water) became and is currently "highly hazardous to human health and safety" requiring "substantial responsive measures to address the [1,4-D] contamination."

In sum, Sanford alleges that the Defendants contaminated its groundwater with hazardous and harmful substances that pose a threat to Sanford's citizens, requiring substantial and immediate remediation to prevent injury. For the purposes of a motion to dismiss, the allegations of the Amended Complaint are sufficient to survive a facial challenge to Sanford's standing. *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 (11th Cir. 2004) ("[Plaintiff's] factual showing that the soil on her land was contaminated, that USTs were leaking, and that solid waste migrated onto [her] property is sufficient to satisfy the injury-in-fact requirement.").

The Defendants note the inconsistency in Sanford's arguments. On the one hand, Sanford argues that 1,4-D is hazardous irrespective of regulatory guidelines. On the other hand, exhibits attached to the Amended Complaint suggest that contamination below the HAL is not hazardous. Ultimately, though, factual determinations are "inappropriate in deciding a motion to dismiss," *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 977 (11th Cir. 2015), and exhibits should only control if they "plainly show that the complaint's allegations are untrue by providing specific factual details that foreclose recovery as a matter of law." *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1245 (11th Cir. 2016) (cleaned up).

### B. At This Stage of the Case, Sanford's Claims are Sufficiently Ripe.

If there is sufficient injury to meet the Article III "case" or "controversy" requirement, then the Court must next determine whether the claim is sufficiently ripe for adjudication.

*Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998) (citing *Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997)).

For the reasons discussed above, Sanford sufficiently pled an injury-in-fact based on the presence of harmful chemicals in its ground water and its need to take remedial measures. Sanford also alleged that harmful chemicals are still migrating into its groundwater continuously, and the continuous migration poses an imminent threat of future harm should the levels continue to rise. This is sufficient to establish ripeness, at this stage. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that the plaintiff must demonstrate a "real and immediate threat" of future injury when seeking prospective relief).

**C. Count V is Due to be Dismissed Because it is Not Asserted by a Statutorily-Authorized Relator Under Section 60.05, Fla. Stat.**

General Dynamics argues that Count V is due to be dismissed because it is not brought by any of the persons enumerated in section 60.05, Florida Statutes. Instead, Count V is brought by privately-retained counsel for Sanford. Under section 60.05, an action may be brought in the name of the State by "the Attorney General, state attorney, city attorney, county attorney, sheriff, or any citizen of the county." § 60.05, Fla. Stat. Sanford responds that Count V is brought by the City of Sanford as a "citizen of the county." However, paragraph 160 of the Amended Complaint alleges that "DSK Law has been retained by the City of Sanford for this case and is accordingly the City of Sanford's the [sic] City Attorney for this lawsuit," so General Dynamics' argument is well-taken. Count V is due to be dismissed without prejudice, with leave to amend.

### D. Count VI is Due to be Dismissed Because Sanford is Not an Intended Third-Party Beneficiary to the Agreement.

To maintain its claim for breach of contract, Sanford must have an interest protected by the Agreement. Sanford is not a party to the Agreement, so its pursuit of the claim depends on whether, as a matter of law, it was an intended third-party beneficiary.

The Defendants argue that Sanford cannot be an intended third-party beneficiary, because Sanford is not even mentioned in the Agreement. Sanford agrees that there is no reference to it in the Agreement, but self-identifies as a third-party beneficiary because the Agreement by its terms was "intended to promote certainty, efficiency and accountability and to safeguard the drinking water resources for the citizens of the City of Lake Mary (the "City") and State of Florida."

As a starting point, Sanford's statement that it is an intended third-party beneficiary is a legal conclusion, since some application of facts to law is necessary to make the statement. Unlike factual allegations, the Court is not bound to accept legal conclusions as true at this stage. *Iqbal*, 556 U.S. at 678. For the purposes of a motion to dismiss, the legal conclusion that Sanford is a third-party beneficiary must be supported by factual allegations to be sufficient. *See id.* at 679. Here, Sanford has attached the Agreement to the Amended Complaint and relies on it to support its allegations. (See Doc. # 69-1.) The Defendants argue that the well-pleaded facts, including the text of the Agreement, do not support Sanford's legal conclusion that it is an intended third-party beneficiary.

"The question of whether, for standing purposes, a non-party to a contract has a legally enforceable right [under the contract] is a matter of state law." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005). In Florida, "to establish an action for breach of a third

party beneficiary contract, the third-party beneficiary must allege and prove the following four elements: (1) existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach." *Mendez v. Hampton Ct. Nursing Ctr., LLC*, 203 So. 3d 146, 148 (Fla. 2016) (cleaned up).

A non-party is a third-party beneficiary "only if a direct and primary object of the contracting parties was to confer a benefit on the third party." *Bochese*, 405 F.3d at 982 (citing *Thompson v. Com. Union Ins. Co. of New York*, 250 So. 2d 259, 262 (Fla. 1971)). If the contract does not express such a purpose, then "any benefit from the contract reaped by the third party is merely 'incidental,' and the third party has no legally enforceable right in the subject matter of the contract." *Id.*

"The object in contract interpretation is to identify the intent of the parties, and the best evidence of the intent is the language of the agreement itself." *ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*, 113 F.4th 1312, 1321 (11th Cir. 2024). "Florida courts' approach to interpreting legal texts, including contracts, 'reflects a commitment to the supremacy-of-text principle, recognizing that the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *City of Lake Worth v. Viera*, No. 4D2024-3001, 2026 WL 2177685, at *8 (Fla. 4th DCA July 22, 2026) (cleaned up) (citing *Planned Parenthood of Sw. & Cent. Florida v. State*, 384 So. 3d 67, 77 (Fla. 2024)). A provision of a contract "cannot be viewed in isolation from the full textual context of which [it is] a part." *See Allstate Ins. Co. v. Revival Chiropractic, LLC*, 385 So. 3d 107, 113 (Fla. 2024). Thus, when interpreting an agreement under Florida law, the analysis begins with the plain meaning of the text, looking

to "all the textual and structural clues that bear on the meaning of a disputed text" and using the traditional interpretive canons for guidance where helpful. *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (cleaned up).

Here, the Agreement does not name Sanford as an intended third-party beneficiary. In fact, the Agreement says nothing about Sanford at all. To find that a non-party to an agreement is an intended third-party beneficiary, "it must be established that the parties to the contract actually and expressly intended to benefit the third party." *Biscayne Inv. Grp., Ltd. v. Guarantee Mgmt. Servs., Inc.*, 903 So. 2d 251, 254 (Fla. 3d DCA 2005). There is something peculiar about an argument that an agreement that says literally not one thing about Sanford could "[c]learly and unmistakably communicate[]" an intention to benefit Sanford. *Express*, Black's Law Dictionary (12th ed. 2024).

But Sanford has a response to this. Sanford argues that, while it is not explicitly named, it was nevertheless expressly intended as a beneficiary because Sanford is located within Florida, and the Agreement was "intended to . . . safeguard the drinking water resources for the citizens of the City of Lake Mary (the "City") *and State of Florida*." (emphasis added). Thus, Sanford contends that the municipality "has standing on behalf of its citizens and customers, who, along with [Sanford] are directly impacted by the contaminants that Defendants discharged." But this argument calls for the text to be read in isolation, divorced from context, and without regard for applicable precedent.

"Words are to be given the meaning that proper grammar and usage would assign them." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012). Grammatically, "citizens of" is a prepositional phrase. To determine the subject of

the prepositional phrase, various canons of interpretation could be implicated. In this particular case, arguably there are canons that point in different directions.

For example, under the last antecedent canon "[a] pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent." *Id.* at 144. Under that canon, a prepositional phrase like "citizens of" would ordinarily be understood to modify the nearest reasonable noun. The nearest reasonable noun is the City of Lake Mary, which would support the Defendants' reading of the text.

Under the negative implication canon, "[t]he expression of one thing implies the exclusion others." *Id.* at 107. Arguably, by expressing an intent to benefit the citizens of one city, the citizens of other units of municipal government were excluded by implication.

Under the surplusage canon, "[i]f possible, every word and every provision is to be given effect," "[n]one should be ignored," and "[n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Id.* at 174. If "citizens of" is a prepositive modifier of both "City of Lake Mary" and "State of Florida," then the reference to City of Lake Mary was superfluous, since the City of Lake Mary is within the State of Florida and every citizen of Lake Mary is also a citizen of the State of Florida. Giving effect to both "City of Lake Mary" and "State of Florida" suggests that "citizens of" was meant to modify only the City of Lake Mary, and the reference to "State of Florida" was a reference to the State in the sense of its relationship to FDEP.

On the other hand, the series qualifier canon suggests that the prepositional phrase "citizens of" could be understood to be a prepositive modifier of the entire series, which includes both the City of Lake Mary and "State of Florida." Under the series qualifier canon,

"[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *Id.* at 147. Omission of "the" before the noun "State of Florida" arguably supports the series qualifier reading.

But the semantic and syntactic canons discussed above all must be considered within the broader context of the Agreement. "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Scalia & Garner, *supra* at 167.

"Context is a primary determinant of meaning." *Id.* Considerations of context become especially important when semantic and syntactic canons could support more than one reading of the text.

The context here is a Cleanup Agreement Document within the meaning of Florida Administrative Code Rule 62-780.200(8). A Cleanup Agreement Document "establish[es] the time frames, schedules, and milestones for completion of site rehabilitation tasks and submission of technical documents, and other commitments or provisions pursuant to" the chapter of the Florida Administrative Code governing contaminated site cleanup criteria. Rule 62-780.200(8), Fla. Admin. Code. Neither Chapter 62-780 nor its related statutory provisions provide for a private right of action for failure to comply with the administrative rules.

Where an agreement with a government entity "simply incorporate[s] statutory obligations" into the agreement and "record[s] the [companies'] agreement to abide by them," the agreement simply serves as the means by which a company "opt[s] into the statutory

scheme." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011). This is evident when the contract is essentially a "form agreement," "composed by the agency" which contains "no negotiable terms." *Id.* (cleaned up). A suit to enforce the agreement, therefore, is "in essence a suit to enforce the statute itself." *Id.* Thus, where the statute does not contain a direct private right of action, it follows that a third-party private contract action would be inconsistent with the statutory scheme. *Id.* (citing *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003)).

Now consider that the Agreement is between (1) an agency of the State of Florida, the Florida Department of Environmental Protection and (2) the Defendants about a contaminated site located in (3) the City of Lake Mary, Florida. Under Florida law, FDEP is an arm of the State, carrying out a state function in protecting Florida's environment. *See* Fla. Stat. § 403.021. It is the agency of the State of Florida with the power and duty to administer the laws, rules, and regulations pertaining to water pollution. Fla. Stat. § 403.051. Under Florida law, civil penalties and injunctive relief are available remedies for pollution, and Florida law further imposes strict liability for the discharge of hazardous substances and provides for recovery of state funds used to address such discharges. It is within FDEP's authority to issue orders as are necessary to effectuate the control of water pollution and enforce the same by all appropriate administrative and judicial proceedings.

The Agreement defines "the City" as the City of Lake Mary, and it contains multiple references to the City. There are no references to the City of Sanford. Again, the City of Sanford appears nowhere in the Agreement. The clear focus of the agreement is

contamination at a site "known as the former Siemens facility . . . located in the City of Lake Mary, in Seminole County, Florida."

The Agreement contemplates that the City of Lake Mary had municipal water supply wells located in the vicinity of the contaminated site. At the time of the Agreement, the City of Lake Mary's public water supply system was "in compliance with applicable regulations" and the water at the point of distribution was "below applicable regulatory standards" but the private parties to the Agreement had "voluntarily conducted testing" and had "begun evaluation of alternative remedial strategies" with respect to the contamination, to "reduce concentrations" of the contaminant before a potential modification by the State of Florida that would reduce the acceptable level of contamination.

The Agreement "establishe[d] the actions" that the private parties "agree[d] to take, and the timeframes under which th[o]se actions w[ould] be completed, to assess and develop a remedial strategy." The express intention of the parties was that "upon implementation of the remedial strategy pursuant to [the] Agreement, the concentration" of contamination would not exceed a certain level. The private parties agreed to "submit a remedial action plan" to FDEP "providing for the rehabilitation of the Site in its entirety" in accordance with certain provisions of the Florida Administrative Code. "Nothing" about the Agreement was to be "construed to limit the authority of [FDEP] to undertake any action in response to, or to recover the costs of responding to, conditions at or from the Site that require [FDEP] to take action to abate an imminent hazard to the public health, welfare or the environment." Perhaps for that reason, the Agreement itself provides no explicit remedy for breach.

Taking the precedent, text, and context together, it is very clear that Sanford was not an intended third-party beneficiary. While there are canons of construction that could go either way, contextualizing the text makes clear that any benefit Sanford received from this Agreement was purely incidental, because the focus was on the City of Lake Mary.

In interpreting legal texts, courts "take care not to create confusion by adding hidden meanings, terms, conditions, or unexpressed intentions," and should avoid treating terms "as redundant or mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it." *Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1293 (11th Cir. 2019) (cleaned up). "If a provision is susceptible of (1) a meaning that . . . deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred." Scalia & Garner, *supra*, at 176. Under Sanford's interpretation of the provision, the reference to the City of Lake Mary is meaningless and redundant, deprived of all independent effect. Under the Defendants' interpretation of the Agreement, "City of Lake Mary" and "State of Florida" are both given independent effect.

"State of Florida" is elsewhere used throughout the Agreement only ever in relation to FDEP ("the *State of Florida* Department of Environment Protection") or to the State as a unit of government ("The Department is the agency of the *State of Florida* . . . ."). FDEP is an executive agency empowered by the State of Florida to protect the public with "the duty to control and prohibit pollution of air and water in accordance with the law and rules adopted and promulgated by it." Fla. Stat. § 403.061. The Agreement does not otherwise refer to or contemplate the citizens of the entire state. The most reasonable reading gives effect to the words by interpreting them to mean Florida as a unit of government, of which FDEP is an

agency. This interpretation is consistent with the Agreement as a whole. Although FDEP is an arm of the State of Florida, *see* Fla. Stat. § 403.021, Sanford, as a municipal corporation, is not.[3] *See Galette v. New Jersey Transit Corp.*, 607 U.S. 509, 532 (2026); *see also Lincoln Cnty. v. Luning*, 133 U.S. 529, 530–31 (1890) (holding municipal corporations are not arms of the State).

Sanford further argues that because the Agreement required the Defendants to clean up contamination that resulted from migration and discharge, Sanford—an entity that receives migrated, contaminated water—is an intended third-party beneficiary. However, the conferral of some incidental benefit on Sanford does not make it an intended third-party beneficiary. *See Ahmed v. Hamilton Ins. DAC*, 409 So. 3d 704, 708 (Fla. 3d DCA 2025) (rejecting the notion that a non-party to an agreement was an intended third-party beneficiary simply because the agreement conferred *some* benefit on him, where the agreement itself did not manifest intent to "*primarily* and *directly*" benefit him) (emphasis added). For the reasons stated before, the Agreement cannot be said to manifest any intent to primarily and directly benefit the citizens of Sanford. To the contrary, the Agreement manifests an intent only to benefit the citizens in and around the origin of the contamination, near the Site at Lake Mary.

As a reasonable double-check against this interpretation of the Agreement, it is notable that, generally, the law does not recognize third-party standing to enforce a contract with an obvious public purpose, when the third party is not mentioned in the contract by name. *See*

[3] In Count V, Sanford proceeds as "State Ex Rel., City of Sanford" under Florida Statute section 60.05 to enjoin a public nuisance. Although Sanford may proceed in the name of the state for the purposes of seeking injunctive relief under that claim, section 60.05 cannot be construed to also confer standing under the Agreement on a separate breach of contract claim.

*Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 525 (Fla. 4th DCA 2002); *see also Gallagher v. Cont'l Ins. Co.*, 502 F.2d 827, 833 (10th Cir. 1974) (holding no third party status for unnamed members of public at large to enforce contract between state and contractor); *Schell v. Nat'l Flood Insurer's Ass'n*, 520 F. Supp. 150, 157–58 (D. Colo. 1981) (finding that contracts between federal government and the National Flood Insurers Association did not create duty to inform public at large of availability of flood insurance).

Because Sanford does not meet the criteria to be an intended third-party beneficiary under the Agreement, it lacks standing to enforce the Agreement's provisions against the Defendants. Accordingly, the Motions are due to be granted in part as to Count VI and the claim dismissed. *See Hollywood Lakes Country Club v. Cmty. Ass'n Servs., Inc.*, 770 So. 2d 716, 719 (Fla. 4th DCA 2000) (affirming dismissal where the contract showed "no intent to directly and substantially benefit the [third-party]"); *Horizon Images, Inc. v. Delta Color Graphics, Inc.*, 639 So. 2d 186, 187 (Fla. 4th DCA 1994) ("There *must* . . . be a clear intention *in the contract* between [the contracting parties] to directly and substantially benefit [the third-party], in order for [the third-party] to sue on the third party beneficiary theory.") (emphasis added).

**E. With the Dismissal of Count VI, the Remainder of the Amended Complaint is an Impermissible Shotgun Pleading.**

Dismissal of Count VI renders the Amended Complaint a shotgun pleading. The Federal Rules of Civil Procedure mandate that a pleading contain the following:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a). The allegations must be simple, concise, and direct. Fed. R. Civ. P. 8(d)(1). In addition, "[a] party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b).

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Recognizing that the use of the label "shotgun pleading" may be imprecise, the Eleventh Circuit has "identified four rough types or categories of shotgun pleadings." *Id.* at 1321. "The most common type . . . is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* The second type is one that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1321–22. The third type fails to "separat[e] into a different count each cause of action or claim for relief." *Id.* at 1322–23. The fourth type "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.*

Although "it is much easier in the short term to permit shotgun pleadings . . . instead of intervening *sua sponte* to narrow the issues . . . district courts have the power and the duty

to define the issues at the earliest stages of litigation" and it is appropriate to "quickly demand repleader" to avoid being "drowned in an uncharted sea," a "massive record," and "loose pleadings." *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998).

Here, it is necessary to direct repleader now that Count VI is dismissed. Starting in paragraph 49, the Amended Complaint makes repeated allegations regarding the Agreement between FDEP and the Defendants. These allegations include the Defendants' (1) many obligations pursuant to the Agreement (Doc. # 69 ¶¶ 50, 55, 56, 58, 66, 71, 82); (2) admissions made within the Agreement (*id.* ¶ 51); and (3) breach of the Agreement as to Sanford (*id.* ¶¶ 53, 61, 71, 83). The counts that follow incorporate paragraphs 1–48 and 50–105 as if fully set forth therein. (*Id.* ¶¶ 106, 116, 129, 136, 148, 177.) Sanford's jurisdictional allegations further incorporate the allegations referencing the Agreement (*see id.* ¶¶ 11, 13–18), even citing the Agreement as an independent basis for venue and jurisdiction. (*See id.* ¶ 12.) With the dismissal of Count VI and a determination that Sanford lacks standing to enforce the Agreement as an intended-third party beneficiary, the remainder of the Amended Complaint incorporates now-immaterial allegations.

The "self-evident" purpose of Rules 8 and 10 is "to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading." *Weiland*, 792 F.3d at 1320 (cleaned up). The rules also benefit the Court, which must be able to determine "which facts support which claims," "whether the plaintiff has stated any claims upon which relief can be granted," and whether evidence to be

introduced at trial is relevant. *Id.* (quoting *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520,1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)).

When it amends its complaint, for the reasons General Dynamics and Siemens raised in their motions, Sanford must more definitely state the factual basis of its claim in Count III, including the nature of the activity it alleges was "ultrahazardous" in Count III. Additionally, when the complaint is amended, Sanford must affirmatively plead a factual basis for the conclusion that the issues in Counts I and V are not "issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956), and should also plead whether there is a pending administrative proceeding that addresses the issues raised in Sanford's complaint. If the defendants move to dismiss the next amendment to Sanford's complaint, they should address in their briefing the effect, if any, Article V, section 21 of the Florida Constitution (a 2018 amendment) and *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) on the primary jurisdiction doctrine in Florida.

**F. Count VII is Due to be Dismissed Because Full, Adequate, and Complete Relief Can Be Secured Through Other Claims.**

General Dynamics argues that Count VII should be dismissed because full, adequate, and complete relief can be secured through other counts Sanford alleges in its Amended Complaint. Sanford responds that its declaratory judgment claim is not duplicative or unnecessary. For the reasons General Dynamics argues in its Motion and Reply, as well as the reasons already provided in relation to Sanford's argument that it is an intended third-party beneficiary, Count VII is due to be dismissed.

## IV. CONCLUSION

The Motions are due to be granted in part, to the extent that Count V is dismissed without prejudice, Count VI is dismissed with prejudice, Count VII is dismissed without prejudice, and the balance of the Amended Complaint is dismissed as a shotgun pleading, with leave to amend. If Sanford has a good faith basis to do so under Rule 11, it is granted leave to amend in compliance with this Order and all applicable rules no later than October 9, 2026. Failure to timely amend may result in dismissal without prejudice without further notice.

Accordingly, it is now

**ORDERED** and **ADJUDGED** that:

1. Defendants General Dynamics Corporation and General Dynamics Land Systems, Inc.'s Motion to Dismiss (Doc. # 82) is **GRANTED in part** and **DENIED in part**;
2. Defendant Siemens Corporation's Motion to Dismiss (Doc. # 83) is **GRANTED in part** and **DENIED in part**;
3. Defendant MONI Holdings LLC's Motion to Dismiss (Doc. # 85) is **GRANTED in part** and **DENIED in part**;
4. Count V is **DISMISSED without prejudice**, with leave to amend;
5. Count VI is **DISMISSED with prejudice**;
6. Count VII is **DISMISSED without prejudice**, with leave to amend;
7. The Amended Complaint (Doc. # 69) is **DISMISSED without prejudice** with a demand for repleader;

8. Sanford may file an amended pleading that complies with this Order and all applicable rules by October 9, 2026;

9. The Clerk is directed to terminate any other pending motions and close the file, pending Sanford's filing of an amended complaint. If an amended complaint is timely filed, the Clerk is directed to reopen the case without the need for further Order; and

10. If Sanford timely amends, the parties are directed to propose an amended case management order within 10 days of the date the amended complaint is filed.

**DONE** and **ORDERED** in Chambers in Orlando, Florida, on this September 23, 2026.

ANNE-LEIGH GAYLORD MOE
UNITED STATES DISTRICT JUDGE

**Copies Furnished To:**
Counsel of Record